IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MARTIN MIERA,<br><br>     Plaintiff,<br><br>      v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>     Defendant. | **MEMORANDUM<br>DECISION AND ORDER**<br><br><br>Case No. 2:12-cv-317-RJS<br><br>Judge Robert J. Shelby |

Plaintiff Martin Miera appeals a denial of social security disability benefits.  The Social Security Administration twice denied Mr. Miera's claims and an Administrative Law Judge did the same on review.  For the reasons stated below, the court affirms the ALJ's decision.

## BACKGROUND

### I.  Mr. Miera's Injuries

Mr. Miera previously worked as a carpenter, roofer, and brick washer.[1]  In November 2005, he fell from a ladder while working on a roof, injuring his hip and shoulder.[2]  Five days later, he sought medical assistance for hip pain.[3]  He eventually underwent surgery to place a screw in his right femur.[4]  After this initial operation, he took over-the-counter medications such as Ibuprofen to manage residual pain.[5]

---

[1] Administrative Record, Dkt. No. 6 ("R."), at 34–35.
[2] R. at 231.
[3] Id.
[4] Id. at 233–34.
[5] Id. at 251.

In August 2010, Mr. Miera suffered a second accident when a car fell on his left shoulder while he was making underbody automotive repairs.[6]  He went to the emergency room, complaining of a tender shoulder.[7]  The initial treating doctor found that Mr. Miera had significant tenderness and mild swelling in his left shoulder but normal strength in his hands.[8]  An x-ray revealed that Mr. Miera had suffered fractures to his posterior ribs and shoulder.[9]  Doctors treated Mr. Miera with a splint and gave him a one-time prescription for narcotic pain medication.[10]  These treatments for the November 2005 fall and the August 2010 automotive repair accident were the only times Mr. Miera sought medical treatment before August 23, 2011, when the ALJ affirmed the denial of disability benefits.  He did, however, receive several medical evaluations before the denial.

## II.  Medical Evaluations

### A.  Dr. Ingebretsen

Mr. Miera's first evaluation occurred on March 11, 2008 with Dr. Richard J. Ingebretsen.[11]  Dr. Ingebretsen observed that Mr. Miera could walk up steps with some difficulty, lift fifty pounds and carry it a short distance, and sit for several hours but could only stand for a half hour before experiencing some right leg pain.[12]  He could hop only on his left foot because of the pain.[13]  Dr. Ingebretsen noted that Mr. Miera took care of himself and his father around the house and was "independent in all activities of daily living and self care."[14]  Dr. Ingebretsen also

---

[6] *Id.* at 308.
[7] *Id.*
[8] *Id.* at 309.
[9] *Id.*
[10] *Id.*
[11] *Id.* at 315–26.
[12] *Id.* at 325.
[13] *Id.*
[14] *Id.*

noted that Mr. Miera "walked in easily without a use of a cane and moved easily" during the examination.[15]

Dr. Ingebretsen examined Mr. Miera again on October 29, 2009.[16]  The record of this examination reflected results similar to the previous examination: Mr. Miera could walk with a normal gait, experienced occasional pain in his right ankle, could hop on it only once, and took care of himself and lived independently at home.[17]  Dr. Ingebretsen found that Mr. Miera had a full range of motion in his right hip, right knee, and right ankle but that Mr. Miera could not hop on this ankle for fear of pain.[18]

**B.  Dr. Ririe**

On November 4, 2009, Dr. Jonathan J. Ririe performed an examination of Mr. Miera at the request of Mr. Miera's attorney.[19]  Dr. Ririe found that Mr. Miera was alert and oriented, and capable of tracking a conversation and proceeding in a logical, sequential manner when speaking. [20]  Dr. Ririe also found that Mr. Miera had intact comprehension, had difficulty processing tasks given to him (such as a block-design task), and struggled with questions of social judgment.[21]  Further, Dr. Ririe found that Mr. Miera "perform[ed] slightly better on nonverbal based tasks such as nonverbal abstract reasoning . . . [but] on timed tasks . . . had more difficulties."[22]  Dr. Ririe also found that Mr. Miera struggled with school-based learning, social judgment, and reasoning.[23]

---

[15] *Id.* at 324.
[16] *Id.* at 246–48.
[17] *Id.*
[18] *Id.* at 248.
[19] *Id.* at 249–55.
[20] *Id.* at 253–54.
[21] *Id.* at 254.
[22] *Id.* at 254–55.
[23] *Id.*

Dr. Ririe ultimately concluded that Mr. Miera had a "cognitive disorder" with "borderline intellectual functioning."[24]  He diagnosed Mr. Miera as having "limited intellectual ability" and concluded that Mr. Miera "would likely continue to struggle and require some level of oversight and assistance to much of his functioning."[25]

### C.  Dr. DeBerard

On December 4, 2009, Dr. Michael DeBerard, a psychologist, performed a mental residual functional capacity assessment.[26]  Dr. DeBerard found that Mr. Miera struggled to process detailed instructions and was moderately limited in carrying out tasks constituting an average work week.[27]  Dr. DeBerard also found that Mr. Miera was moderately limited in his ability to respond appropriately to changes in a work setting and found that Mr. Miera's complaints constituted "partially credible allegations of cognitive disorder" but that he "appear[ed] capable of simple work from a psychological perspective."[28]

### D.  Dr. Barton

On December 16, 2009, Dr. Lewis J. Barton performed a physical residual functional capacity assessment.[29]  Dr. Barton found that Mr. Miera could carry twenty pounds occasionally and ten pounds frequently and that Mr. Miera could stand or sit for about six hours in an eight-hour workday.[30]  Dr. Barton noted that the fracture Mr. Miera suffered from his fall off the ladder had successfully healed.[31]

---

[24] *Id.* at 255.
[25] *Id.*
[26] *Id.* at 292–94.
[27] *Id.*
[28] *Id.* at 294.
[29] *Id.* at 284–91.
[30] *Id.* at 285.
[31] *Id.* at 291.

### E.  Drs. Peterson and Sullivan

On April 12, 2010, Dr. David O. Peterson conducted a review of Dr. Barton's and Dr. Ingebretsen's examinations.[32]  Dr. Peterson affirmed the other doctors' conclusions and found that Mr. Miera was capable of light functional capacity work and maybe capable of more.[33]  On April 13, 2010, Dr. Laurie Sullivan reviewed Dr. DeBerard's mental residual functional capacity assessment.[34]  Dr. Sullivan affirmed Dr. DeBerard's prior assessment, noting that Mr. Miera's difficulties were consistent with someone of low intellectual functioning but that he was "still capable of simple routine work."[35]

## III.  ALJ Decision

Mr. Miera had a hearing before an ALJ on July 19, 2011.[36]  The ALJ engaged in a lengthy colloquy with Mr. Miera concerning his ability to lift and carry items and how long he could stand or sit without pain.[37]  The ALJ also spoke with Mr. Miera regarding his intellectual understanding of everyday tasks: counting change, reading labels, reading the newspaper, and keeping up with newsworthy events.[38]  Mr. Miera testified that his pain was normally a three or four out of ten but that it rose to a seven or eight during rainstorms, when the barometric pressure dropped.[39]

The ALJ also engaged a neutral vocational expert who noted that Mr. Miera's brick-washing job did not fit in an exact Dictionary of Occupational Titles (DOT) category.[40]  The ALJ

---

[32] *Id.* at 296.
[33] *Id.*
[34] *Id.* at 297.
[35] *Id.*
[36] *Id.* at 34.
[37] *Id.* at 36–46.
[38] *Id.* at 49–54.
[39] *Id.* at 51.
[40] *Id.* at 68–72.

determined it to be medium unskilled work.[41]  After considering a hypothetical set of work conditions proposed by the ALJ, the vocational expert opined that Mr. Miera could perform no jobs from his past work.[42]

Ultimately, the ALJ considered all the evidence and found that Mr. Miera could perform his past brick-washer job and thus found that he was not fully disabled.  At Step One, the ALJ found that Mr. Miera had not participated in substantial gainful activity.[43]  At Step Two, the ALJ found that Mr. Miera had a severe condition, namely, degenerative joint disease of the right hip, cognitive disorder, and borderline intellectual functioning.[44]  At Step Three, the ALJ found that Mr. Miera did not have an impairment that met the medical severity of a listed impairment.[45]  At Step Four, the ALJ assessed Mr. Miera's residual functional capacity and determined that Mr. Miera had the capacity to perform "the full range of medium work" except work that required more than a "low concentration level" and "low memory level" and work that involved "vibrations, jarring or jolting due to knee and hip pain."[46]

At bottom, the ALJ based the denial on the premise that "the claimant does not experience disabling pain but can do the work suggested by the vocational expert with the levels of pain he is experiencing."[47]  The ALJ further concluded that, while there was some history of low intellectual functioning, there was not enough evidence to determine these conditions had existed throughout Mr. Miera's lifetime.[48]  Moreover, Mr. Miera's low intellectual functioning did not affect his ability to perform everyday tasks, think, remember, or understand, and

---

[41] *Id.* at 69.
[42] *Id.* at 70–72.
[43] *Id.* at 18.
[44] *Id.*
[45] *Id.* at 18–19.
[46] *Id.* at 20.
[47] *Id.* at 24.
[48] *Id.* at 23.

therefore did not restrict him from performing simple, routine work.[49]  The ALJ also found that

Mr. Miera's claims of total disability were not completely credible because there was little

evidence that he had not healed and no substantial medical records from visits or complaints

existed between his fall in 2005 and 2009.[50]

The ALJ relied on the examination performed by Dr. Ingebretsen to conclude that the

only physical issue Mr. Miera presented was difficulty hopping on his right foot.[51]  Additionally,

the ALJ discounted Mr. Miera's credibility: "the claimant's allegations are somewhat out-of-

proportion to the medical findings, and generally not compatible or reasonably consistent with

the medical evidence of record and all other evidence—and therefore not fully persuasive."[52]

The ALJ found that Mr. Miera could perform his past relevant work as a brick washer and

therefore Mr. Miera was not disabled from December 1, 2005 to the August 23, 2011 decision

date.[53]  This decision is now before the court on appeal.

## ANALYSIS

### I.  Standard of Review

The court reviews an ALJ's decision below to determine whether substantial evidence in

the record as a whole supports the factual findings and whether the correct legal standards were

applied.[54]  "Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  It requires more than a scintilla, but less than a

preponderance."[55]  Importantly, the court cannot reweigh the evidence or substitute its own

---

[49] *Id.* at 24.
[50] *Id.* at 21.
[51] *Id.* at 22.
[52] *Id.* at 23.
[53] *Id.* at 26–27.
[54] *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).
[55] *Id.*; *see also Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938).

judgment for the ALJ's.[56]  Instead, the court must "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking into account whatever in the record fairly detracts from its weight."[57]  But the court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."[58]

## II.  Five-Step Disability Determination

On appeal, the court is reviewing the agency's required five-step disability analysis, which determines whether a claimant is disabled.[59]  The claimant bears the burden of proof at the first four stages.[60]  Step One requires the claimant to demonstrate "that he is not presently engaged in substantial gainful activity."[61]  At Step Two, the claimant must show "that he has a medically severe impairment or combination of impairments."[62]  At Step Three, if a claimant can show that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits.[63]  If a claimant cannot meet a listing at Step Three, he continues to Step Four, which requires him to show "that the impairment or combination of impairments prevents him from performing his past work."[64]  When a claimant meets the burden in the first four steps, the Commissioner must show at Step Five that "the claimant retains sufficient [residual functional capacity] to perform work in the national economy, given her age, education, and work

---

[56] *Lax*, 489 F.3d at 1084.
[57] *Hamlin v. Barnhart*, 365 F.3d 1208, 1241 (10th Cir. 2004).
[58] *Lax*, 489 F.3d at 1084 (citation omitted).
[59] *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005).
[60] *Id.*
[61] *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).
[62] *Id.*
[63] *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).
[64] *Grogan*, 399 F.3d at 1261.

experience."[65]  Lastly, "[i]f a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."[66]

## III.  Mr. Miera's Arguments on Appeal

Mr. Miera makes four arguments on appeal.  First, he argues that substantial evidence did not support the ALJ's finding that his condition did not meet Listing 12.05C for mental disability.  Second, he argues that the ALJ's determination of his residual functional capacity similarly was not supported by substantial evidence and was contrary to the evidence in the record.  Third, he argues that the ALJ's determination that he could perform his past relevant work was made in error because of the ALJ's failure to accurately describe his previous work.  Fourth, he argues that a subsequent favorable decision certifying him for benefits should control here because it renders this earlier decision inconsistent.  The court takes up each of these arguments in turn.  In the end, the court finds that the ALJ's conclusions were supported by substantial evidence, no legal error was committed, and the subsequent favorable decision does not control here.

### A.  Listing 12.05C Disability

Mr. Miera argues that the ALJ erred when finding that Mr. Miera did not meet the requirements for mental disability under Listing 12.05C.  In particular, Mr. Miera argues that the ALJ based his decision on the fact that "the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."[67]  He argues that this finding is contrary to the record and that there is no substantial evidence remaining to support the ALJ's conclusion at Step Three.

---

[65] *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005).
[66] *Williams*, 844 F.2d at 750.
[67] R. at 20.

There are three criteria that must be satisfied for Mr. Miera to meet Listing 12.05C for mental disability.  First, he must meet the capsule definition that governs all mental disability claims.  To meet the capsule definition, he must prove that he suffers from "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[68]  Second, he must also prove he has "[a] valid verbal, performance, or full scale IQ of 60 through 70."[69]  Third, he must show that he suffers from "a physical or other mental impairment imposing an additional and significant work-related limitation of function."[70]  To show that he has an impairment that meets Listing 12.05C, Mr. Miera "must provide specific medical findings that support each of the various requisite criteria for the impairment."[71]

Mr. Miera has failed to show that he meets the capsule definition.  As evidence he meets the capsule definition, Mr. Miera points to assorted parts of the medical record, along with his history of impairment demonstrated by dropping out of high school, taking special-education classes, and holding jobs that involve simple tasks.  He also cites to an unpublished district court opinion for the contention that the Tenth Circuit "has noted that other circuits have liberally construed the early manifestation requirement to not require a claimant to affirmatively prove mental retardation prior to age twenty-two, if there is no evidence that his IQ has changed."[72]  Even liberally construing Mr. Miera's arguments and the capsule's early manifestation requirement, it is apparent that the ALJ's conclusion was supported by substantial evidence.

---

[68] 20 C.F.R. pt. 404, subpt. P, app. 1. § 12.05.
[69] *Id.* at § 12.05C.
[70] *Id.*
[71] *Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007).
[72] *Bradley v. Astrue*, No. 12-CV-1138, 2012 WL 5878612 at *3 (D. Kan. Nov. 21, 2012).

At the outset, the court notes that "[t]he ALJ is not required to discuss every piece of evidence" in the record.[73]  An ALJ's decision is "adequate if it discusses the 'uncontroverted evidence' the ALJ chooses not to rely upon and any 'significantly probative evidence' the ALJ decides to reject."[74]  Further, Mr. Miera has the burden to affirmatively prove mental retardation prior to age twenty-two.

The ALJ did not err when he found that Mr. Miera failed to carry his burden.  The evidence regarding Mr. Miera's education and employment history are not significantly probative, and the ALJ properly ignored them.[75]  Moreover, Mr. Miera's citations to medical records in his reply brief are unavailing as they do not specifically address the question of cognitive limitations before age twenty-two.  In sum, Mr. Miera offers little to no medical evidence in the record that illuminates his functioning prior to age twenty-two.  To the contrary, the ALJ found substantial evidence that Mr. Miera is borderline functioning and not severely mentally impaired.  Further, the ALJ credited record evidence of Mr. Miera's daily activities that demonstrated mental competency.  What's more, the ALJ noted that Mr. Miera was in another car accident a few years ago that left him in a coma for over a month.[76]  It is unclear whether the car accident impacted his mental ability.  The ALJ stated that "it is impossible to determine if [Mr. Miera's mental limitations] have existed throughout his life or if they represent a decline in functioning due to his motor vehicle accident."[77]

The ALJ's opinion contains findings that show Mr. Miera had not met his burden to prove he suffered from subaverage general intellectual functioning before the age of twenty-two.

---

[73] *Wall v. Astrue*, 561 F.3d 1048, 1067 (10th Cir. 2009) (citing *Frantz v. Astrue*, 509 F.3d 1299, 1303 (10th Cir. 2007)).

[74] *Id.* (citing *Frantz,* 509 F.3d at 1303).

[75] *See id.* at 1067 n.22 (noting that a claimant's "alleged cognitive deficiency is anecdotal, coming from individuals who neither had a treating relationship with the Claimant nor any psychological expertise").

[76] R. at 23, 246.

[77] *Id.* at 23.

While these findings were not contained in the Step Three section of the ALJ's decision, "an ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment."[78]

In sum, the ALJ's determination that Mr. Miera did not meet Listing 12.05C for mental retardation is supported by substantial evidence in the record as cited to in the decision as a whole.

### B. Residual Functional Capacity

Next, Mr. Miera argues that the court erred in its residual functional capacity findings. "Residual functional capacity represents the capacity of the claimant to perform work, despite mental or physical impairments."[79]  An ALJ must determine a claimant's residual functional capacity based on substantial evidence.[80]  To determine residual functional capacity, "an ALJ must consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe[.]"[81]  Importantly, "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."[82]

#### (1)  Physical Residual Functional Capacity

Mr. Miera argues that the ALJ's conclusion that he could do medium-level work subject to additional physical and mental limitations lacks substantial evidentiary support.  He points to references in the medical record to his ability to lift 20 pounds only occasionally and 10 pounds

---

[78] *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005); *see also id.* at 734.
[79] *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1048 (10th Cir. 1993) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)).
[80] *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004).
[81] *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010) (citing 20 C.F.R. §§ 404.1545(e) and 416.945(e)).
[82] *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

frequently.  He also contends that his cognitive difficulties are supported by findings in the
medical record that the ALJ improperly ignored.

Substantial evidence supports the ALJ's physical residual functional capacity assessment.
The ALJ determined that Mr. Miera could perform a "full range of medium work" with the
physical limitation that such work could not involve "vibrations, jarring or jolting due to knee
and hip pain."[83]  The ALJ properly relied on Mr. Miera's own testimony that he could lift 25
pounds frequently and 50 pounds infrequently.[84]  Mr. Miera further testified that he could carry
groceries (including two gallons of milk), vacuum, do lawn work, do laundry, ride a bicycle on a
daily basis, use public transportation, shop, and attend church.[85]  The ALJ found that this
testimony supported the conclusion that Mr. Miera "retains adequate physical and mental ability
to perform at least light to medium, unskilled work."[86]

The ALJ also relied on Dr. Ingebretsen's October 29, 2009 neurological exam for
evidence that Mr. Miera had normal bilateral strength, a full range of motion in his right hip, a
normal gait, no tenderness in his right knee, and no limp.[87]  Medical records also indicate that
even in 2009, Mr. Miera had an ability to walk three to four blocks and run a short distance.[88]
The ALJ pointed out that the only report from 2008 was that Mr. Miera had minor right hip and
knee pain, could walk easily, and only had difficulty hopping on his right foot.[89]  This report
concluded that "[Mr. Miera's] problem is minor and is confined to his right upper leg and is
exacerbated by cold weather."[90]  Additionally, the absence of medical records between Mr.

---

[83] R. at 20.
[84] *Id.* at 21.
[85] *Id.*
[86] *Id.* at 23–24.
[87] *Id.* at 22.
[88] *Id.* at 21.
[89] *Id.* at 21.
[90] *Id.* at 22.

Miera's surgery following his 2005 fall and 2009 provided the ALJ additional support for his residual functional capacity determination.  In sum, the ALJ reasonably relied on medical record evidence from multiple sources, Mr. Miera's own testimony, and his description of daily activities to conclude that Mr. Miera could perform medium-level exertional work with some limitation.

(2)  *Mental Residual Functional Capacity*

Similarly, substantial evidence supported the determination of Mr. Miera's mental residual functional capacity.  Mr. Miera argues that an ALJ must assess four specific work-related functional areas to determine mental residual functional capacity.[91]  But the ALJ addressed these functional areas when he imposed limited mental conditions in the physical residual functional capacity assessment.[92]  The ALJ cited to Dr. Ririe's report, which detailed Mr. Miera's substantial daily activities and the vague description he gave of his cognitive difficulties.[93]  Dr. Ririe also noted that despite problems with "social judgment" and "reasoning," Mr. Miera's difficulties were consistent with someone with "limited intellectual ability" who processes information in a concrete rather than abstract manner.[94]  Dr. Sullivan confirmed the general scope of these findings and suggested that Mr. Miera "is still capable of simple routine work."[95]

Dr. Ririe's report—coupled with other evidence in the record, including Mr. Miera's extensive daily activities—provided substantial evidence to support the ALJ's conclusion that Mr. Miera should be capable of performing simple types of work activity despite having some

---

[91] *See* SSR 96-8p, 1996 WL 374184 at *6 (July 2, 1996) (noting a claimant's "[w]ork-related mental activities" are to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting").
[92] R. at 20.
[93] *Id.* at 23.
[94] *Id.* at 255.
[95] *Id.* at 297.

14

difficulty with complex work.  The ALJ also noted a general lack of records establishing that Mr. Miera had sought or received treatment for cognitive difficulties since his motor vehicle accident.[96]  In the end, the ALJ concluded that Mr. Miera's mental capacity "was essentially within normal limits save for difficulty processing, grammar problems and a general lack of sophistication due to lack of education and lower IQ."[97]

Mr. Miera further argues that the ALJ improperly discounted the credibility of his testimony on pain and that this error affected the residual functional capacity assessment.  But "[c]redibility determinations are peculiarly the province of the finder of fact, and [the court] will not upset such determinations when supported by substantial evidence."[98]

The ALJ found that Mr. Miera had not engaged in an "intentional lack of full credibility" but that he "can perform at higher levels than he states, or perceives he can."[99]  The ALJ specifically tied this determination to Mr. Miera's extensive daily tasks, both physical and cognitive; evidence that he could still think, remember, and understand (though perhaps not perform complex mental tasks); and the fact that Mr. Miera did not have a prescription to use a cane, take pain medication, or limit his performance of activities of daily living.[100]  The ALJ also again noted the lack of recent medical treatment or records for either mental conditions or physical pain, which "belies [Mr. Miera's] credibility."[101]  The ALJ thus made a robust and specific finding that Mr. Miera's perceived pain and limitations were exaggerated.

The ALJ's determination of Mr. Miera's residual functional capacity is supported by substantial evidence in the record cited to in the decision.  Additionally, the ALJ's credibility

---

[96] *Id.* at 24.
[97] *Id.* at 23.
[98] *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation marks omitted).
[99] R. at 23.
[100] *Id.* at 23–24.
[101] *Id.* at 24.

determination for Mr. Miera's pain was tied to specific findings in both the medical record and the claimant's own testimony. The ALJ properly discounted Mr. Miera's pain testimony based on substantial and specific evidence. The ALJ committed no reversible error at Step Four.

### C. Past Relevant Work

Mr. Miera also argues that the ALJ erred by mischaracterizing his past relevant work and by finding that he could perform it. The Commissioner bears the burden at Step Five.[102] ALJs routinely rely on the classification of a claimant's prior job given by a vocational expert. "Occupational evidence provided by a VE [vocational expert] or VS [vocational specialist] generally should be consistent with the occupational information supplied by the DOT."[103] Further, "before an ALJ may rely on expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask the expert how his or her testimony as to the exertional requirement of identified jobs corresponds with the Dictionary of Occupational Titles, and elicit a reasonable explanation for any discrepancy on this point."[104] Lastly, "Social Security Ruling 00-4p, which essentially codifies *Haddock*, requires a reasonable explanation for conflicts between a VE's testimony and the DOT relating to any 'occupational information.'"[105]

The hearing transcript and the ALJ's decision meet these legal requirements. At the hearing the ALJ extensively questioned Mr. Miera on his past job as a brick washer.[106] The ALJ inquired as to the specific exertional demands of this work: the weight of scaffolding and job equipment such as hoses, sprayers and backpack equipment, the level of pressure in the spraying hose, the safety attire required on the job, the duration of the relevant work, and the scaling and

---

[102] *See Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998).
[103] SSR 00-4p, 2000 WL 1898704 at *2 (Dec. 4, 2000).
[104] *Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999).
[105] *Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005) (citing SSR 00-4p, 2000 WL 1898704 at *2).
[106] R. at 64–67.

climbing requirements, especially as they related to scaffolding and forklifts.[107]  The vocational expert noted that a brick-washer job appeared in the DOT but as a subset duty under hod carrier or brick layer.[108]  Next, the vocational expert asked questions regarding the repositioning of equipment and the frequency with which Mr. Miera would erect his own scaffolding.[109]  After questioning Mr. Miera, the vocational expert noted that the job of hod carrier under the DOT is classified as heavy unskilled work but that Mr. Miera performed the past relevant work at a medium exertional unskilled level.[110]  The vocational expert provided a reasonable explanation for this departure from the DOT's classification here, which the ALJ adopted in his final decision.[111]

In sum, the ALJ did not mischaracterize Mr. Miera's past work as a brick washer but rather took careful and reasonable steps to classify it according to the actual demands of the job as Mr. Miera performed it.  The ALJ's decision adopted the vocational expert's reasonable explanation for his departure from the DOT's classification of hod washer.  Thus, the ALJ committed no reversible error at Step Five.

### D.  Subsequent Favorable Decision

On July 16, 2012, the Social Security Administration found Mr. Miera disabled with an onset date of March 29, 2012.  This favorable disability determination rested on a finding of severe osteoarthritis in the knee that began sometime in 2009.  Mr. Miera argues that a subsequent favorable decision needs to be reconciled with the earlier August 23, 2011 denial.

---

[107] *Id.*
[108] *Id.* at 68.
[109] *Id.* at 68–69.
[110] *Id.* at 69.
[111] *See id.* at 60; *see also id.* at 26 ("[The vocational expert] considered it to be more of (at most) a medium unskilled job as performed.").

Mr. Miera cites no authority for the proposition that a failure to reconcile these decisions would constitute clear error.  Indeed, the July 16, 2012, finding of disability rested on three new pieces of evidence and a new claim of back pain.  This new evidence and new claim preclude Mr. Miera from advancing the argument that the subsequent decision renders this faulty.[112]  A subsequent favorable decision based on evidence not before the ALJ earlier does not require overturning Mr. Miera's previous decision and running his benefits from December 1, 2005.

### CONCLUSION

The ALJ's decision was supported by substantial evidence in all regards and no clear legal error was committed.  The court AFFIRMS the ALJ's decision.

DATED this 17th day of February, 2015.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[112] *See Avalos v. Barnhart*, 78 F. App'x 668, 674 (10th Cir. 2003) (rejecting inconsistency argument when subsequent favorable decision was based on different evidence and centered on a new claim).